IN THE MATTER OF THE SEARCH OF
5150 AND 5154 DUFF DRIVE, WEST
CHESTER, OHIO 45246

Case No. **1:18MJ-508**

**Filed Under Seal**

FILED
RICHARD W. NAGEL
CLERK OF COURT
2018 AUG 24 AM 9: 29
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Brian J. Christ, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 5150 and 5154 Duff

Drive, West Chester, Ohio 45246, hereinafter "PREMISES," further described in Attachment A,

for the things described in Attachment B.

2.      I am a Special Agent with the United States Department of Transportation

(USDOT), Office of Inspector General (OIG), in Columbus, Ohio. I have been employed as a

Special Agent by USDOT-OIG for approximately 3 years. I have successfully completed

criminal investigator training at the Federal Law Enforcement Training Center in Glynco,

Georgia. As a Special Agent with USDOT-OIG, I conduct criminal investigations of individuals

and entities for possible violations of federal criminal laws, particularly those laws found in Title

18 and 49 of the United States Code that are relevant to the USDOT, Federal Motor Carrier

Safety Administration (FMCSA). FMCSA responsibilities include monitoring and enforcing

compliance with regulations governing safety and commerce related to interstate motor carriers,

in particular Title 49, Code of Federal Regulations, Part 375, which governs the transportation of

household goods by motor carriers. Further, I have specific experience and knowledge

investigating the same type of violations set forth in this search warrant. Since my employment, I

1

have participated in numerous search warrants at businesses and residences for documents, records, receipts, and computer-related equipment used to store information.

3.        The facts set forth in this affidavit are based on my own investigation, which includes my own personal observations and knowledge; witness interviews; written witness complaints; documents provided by witnesses; information from FMCSA database systems; information I have received from other agents and investigators; and my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.        This affidavit is submitted in support of an application for a federal warrant to search the Ohio business warehouse of a criminal Enterprise, an association-in-fact of individuals and corporate entities involved in the shipment of household goods, which is located at the PREMISES.

5.        Based on the facts set forth below, there is probable cause to believe that on the PREMISES of the Moving Enterprise there exists evidence of 18 U.S.C. § 1962(d).

## **PROBABLE CAUSE**

### A. **The Grand Jury Charge**

6.        Based on the above, on July 25, 2018, a federal grand jury returned an Indictment charging the following individuals:

> (a) ANDREY SHUKLIN,
>
> (b) SERGHEI VERLAN,
>
> (c) PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann,"
>
> (d) EVGENIA KUKUY, a/k/a "Jenny K," "Evgenia Kukuv,"

2

(e) VLADIMIR PESTEREANU, a/k/a "Vova,"

(f) IEVGEN KARIAKA, a/k/a "Eugene,"

(g) AKHLIDDIN KALONOV,

(h) ROMAN IAKOVLEV,

(i) SANJAR FAYZIVEY,

(j) SERGEY BOCHAROV,

(k) JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and

(l) SETH NEZAT, a/k/a "Andrew Johnson", "Andrew Butler," "Jason," "Kyle Walker,"

(hereinafter, the "defendants"), in a one Count Indictment with participating in a RICO conspiracy through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The indictment is attached and incorporated by reference.

7.     The grand jury found probable cause that the defendants, along with corporate entities JBR Underground, LLC, United National Moving and Storage, National Relocation Solutions, Independent Van Lines, National Relocation Van Lines, US Relocation Systems, First National Moving and Storage, Public Moving and Storage, Public Moving Services, Smart Relocation Solutions, Presidential Moving Services, Unified Van Lines, and Flagship Van Lines (referred to collectively as "the affiliated companies"), and others known and unknown to the Grand Jury, constituted an "Enterprise" as defined in 18 U.S.C. § 1961(4), that is, a group of individuals and entities associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce (referred to hereinafter as the "Moving Enterprise").

8.     The grand jury found probable cause that the defendants violated § 1962(d) by knowingly and intentionally conspiring to conduct and participate in the conduct of the affairs of

3

the Moving Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§

1961(1) and (5), by conspiring to commit multiple acts of 18 U.S.C. § 1343 (relating to wire

fraud); 18 U.S.C. § 659 (relating to the theft from interstate shipment); 18 U.S.C. § 1951(a)

(relating to extortion); and 18 U.S.C. § 1028(a) (relating to fraud and related activity in

connection with identification documents).

### B. The Investigation

9.      Beginning in 2016, the USDOT and the FBI initiated an investigation into

members of a criminal organization involved in the shipment of household goods, following

hundreds of complaints to the USDOT by customers-victims.

10.     The defendants operated and worked through the affiliated companies to move

interstate shipments of household goods. The affiliated companies operated as a single-corporate

entity, all managed and operated by the same owners, leadership, and employees.

11.     The purpose and object of the conspiracy was for the defendants to enrich

themselves and the Moving Enterprise by defrauding and extorting customers who hired the

Enterprise to move their household goods. The Enterprise operated within the Southern District

of Ohio and throughout the country. Generally, the scheme worked as follows: the Moving

Enterprise started a company that represented itself falsely through emails to customers and

representations on their website as a moving company with over a decade of experience and

many satisfied customers. The Enterprise then induced new customers to select its services by

undercutting competition with a low "binding" moving estimate without first conducting an

onsite inspection of household goods. Pursuant to federal regulations, the binding estimate

cannot be changed once movers begin loading. However, in contravention of the law, the

Enterprise routinely increased the price of the binding estimate on site, after household goods

4

were loaded on the moving trucks.

12. Through customer interviews, agents learned that after loading the household goods, the affiliated "moving company" would falsely claim that the goods weigh more and/or take up more cubic footage than contemplated in the binding estimate. The company then extorted the customers into paying an inflated "revised" price to get their goods delivered. The extortion scheme was successful. By waiting until the goods were loaded to increase the price, the customers were vulnerable and desperate. Some customers were told that if the inflated price was not paid in full, the company would keep the household goods. The company has followed through with its threats to keep the household goods of customers who refused to pay the (inflated) revised price, and their goods have not been delivered, sometimes years after the move. For example, agents executing a premises search warrant on May 31, 2017 at the 5150 Duff Dr., West Chester, 45246, warehouse location found household goods from a move that took place on May 24, 2016; the customers have never received their household goods, despite the Enterprise receiving a down payment for delivery of the goods. To date, there are over 900 identified victims of the Enterprise. Agent review of customer documents indicates the Enterprise increased the price above the binding estimate in well over 90% of the moves for which there is adequate documentation.

13. While providing an initial, false, low bid to induce business with no intention of adhering to the estimate was fraudulent, internal documents show the price increase was fraudulent as well. A review of internal documents indicates that the newly calculated cubic feet number is false. Evidence recovered during the execution of a search warrant indicates that the company often tracks the "real" or "actual" cubic feet in contrast to the cubic feet charged to the customers. For example, it was the practice of certain defendants to email to one another

5

documentation indicating the "actual" or "real" cubic footage used in a move, alongside documentation indicating a higher amount of cubic footage that the Enterprise used as the basis for the amount charged to the customer.

14. Once enough customers complain and/or USDOT places that company out of service as set forth in the Indictment, the Enterprise stops operating as that particular moving company. The evidence shows that the Enterprise then "reincarnates" as a new company by submitting false documents to federal regulators and then, once again, misrepresenting the new company's years of service and qualifications to induce victims to use the Enterprise's moving services. The Enterprise has reincarnated as at least twelve different FMCSA-regulated companies since 2013—the affiliated companies as set forth above—all operating as a single entity.

15. According to customer interviews, the Enterprise at times simply refused to deliver a customer's household goods despite receiving payment as agreed to by the parties; losing both their payment for the move and their household goods, the customer had little recourse because the Enterprise reincarnated under a new name every several months. The Enterprise has even threatened violence when doing so furthers the criminal conspiracy, including a bomb threat against employees of a company that operates a warehouse in Maryland where the Enterprise stored certain customers' household goods.

16. One of the defining characteristics about the Enterprise has been concealment— the Enterprise's efforts to conceal its identity, the identity of its leadership, and the true nature of its business. Documents filed with federal authorities repeatedly conceal the true owners of the Enterprise and its ties to past moving businesses that were shut down. In fact, the Enterprise even created counterfeit driver's licenses for individuals it named as owners of "reincarnated"

6

new affiliated companies on federal regulatory filings. Members of the Enterprise also repeatedly concealed their true identities from customers. For example, during execution of a search warrant at the Enterprise's Florida location, agents recovered a list of aliases used by employees. The document indicates that, at that time, roughly two dozen employees used an alias or Sales Name. By frequently reincarnating the Enterprise, the Enterprise concealed the true nature of its business from both federal regulators and customers.

17.     To date, law enforcement agents have identified the following warehouse locations where the Enterprise stores victims' household goods:

a.     17600 Williams, Suite 1, Thornton, Illinois 60476;

b.     1117 Wilso Drive, Baltimore, MD;

c.     724 Montana Drive, Suite A, Charlotte, North Carolina 28216;

d.     5150-5154 Duff Drive, West Chester, Ohio 45246 (the PREMISES);

e.     1 Shoreline Drive, Unit 4, Guilford, CT 06437;

f.     1600 Raley Court, Suite 20, West Sacramento, CA 95691; and

g.     2802 North 29th Avenue, Hollywood, Florida 33020.

### THE SUBJECT PREMISES

18.     Evidence obtained during the course of the investigation shows that the Moving Enterprise maintains a warehouse at the PREMISES. Based on the investigation, I believe that the Moving Enterprise stores customer goods inside the PREMISES.

19.     On July 27, 2018, the day after the grand jury indicted defendants for the RICO conspiracy, the U.S. District Court for the Southern District of Ohio entered a post-indictment restraining order. The restraining order determined that there was probable cause that the

7

defendants engaged in the charged RICO conspiracy; that there was a connection between the contents of property in seven warehouse locations being used by the Moving Enterprise and the offense charged in the Indictment; and that if the defendants are convicted the property in the seven warehouses would be subject to forfeiture under 18 U.S.C. § 1963. The restraining order prevented the defendants named in the Indictment, and others, from entering the warehouse space or otherwise disposing of any property within the warehouses.

20.     Among the warehouses subject to the restraining order was the PREMISES.

21.     Agents have reviewed documents of the Moving Enterprise obtained from search warrants executed during the course of this investigation, and from that review, found, among other things, a lease agreement between an affiliated company of the Moving Enterprise and a limited liability company for the PREMISES.

22.     A spreadsheet found following execution of a search warrant in 2017 listed "warehouse addresses," to include the PREMISES, among other locations. In addition, spreadsheets tracking the location of customers' household goods, list as "warehouse[s]" where customers' goods were held to include the PREMISES, among others.

23.     In July 2018, a mover for Unified Van Lines told a victim of the company trying to find her household goods that her goods were being stored at the company's warehouse in West Chester, Ohio. West Chester, Ohio Police Department officers arrived at 5150-5154 Duff Drive, West Chester, OH and spoke to two individuals looking into the windows of the facility. The individuals stated they were there to purchase furniture that was being advertised on OfferUp.com. Based on my training and experience, this indicates that the Enterprise is selling customer goods out of the warehouse.

8

24. On July 31, 2018, during a search warrant of the Enterprise's corporate office in Hollywood, FL, Agent seized a spreadsheet titled, "Serghei OH List (5)." The spreadsheet had information about various jobs, to include where the household goods were located. The spreadsheet was modified by "Jon Scott" on July 30, 2018. In the "where" column of the spreadsheet, it listed 5150 Duff Drive, West Chester, OH 45246 as the location. This spreadsheet indicates which victims' household goods are stored at the PREMISES. In addition, according to documents uncovered during the above-mentioned search warrant, a customer of the Moving Enterprise with the initials M.C. was charged by an affiliated company for using 1,750 cubic feet of space although his goods only used 1600 cubic feet of space, and his household goods are currently being stored in the PREMISES warehouse. This is consistent with the pattern of criminal activity set forth in the Indictment.

25. On July 31, 2018, agents served the above-mentioned restraining order on the PREMISES. Pursuant to the restraining order, law enforcement agents were permitted to enter the PREMISES with the landlord or representative of the leasing company to secure the PREMISES, document its condition through video and photographs, and ensure the safety of law enforcement agents or other personnel acting under the restraining order. Consistent with the spreadsheet found at the Florida corporate office, agents observed numerous loads of household goods being stored at the warehouse while enforcing the restraining order.

26. Based on my knowledge, training, and experience, the corporate headquarters of household goods moving businesses use computers and other electronic storage mediums to conduct business and save business files from current and past transactions. This is consistent with the way manner in which the defendants operated the Moving Enterprise here. In addition, the investigation indicates that the Moving Enterprise's warehouses store documents relating to

9

moves in both hard copy form and electronically.  For example, a May 2017 search warrant at the PREMISES yielded computers and boxes of documents containing relevant evidence relating to victims' moves.  Based on the search warrant previously executed at the PREMISES, I know that units 5150 and 5154 Duff Drive, West Chester, Ohio 45246 are connected internally.

27.     Consequently, there is probable cause that evidence of the above crimes will be found at the PREMISES.

## TECHNICAL TERMS

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

10

borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

29.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. A storage medium is any physical object upon which computer data can be recorded. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not

11

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.     Based on actual inspection of other evidence related to this investigation, (e.g., email correspondence, binding estimates), I am aware that computer equipment was used to generate and store documents used in the scheme. There is reason to believe that there is a computer system currently located on the PREMISES.

31.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

12

cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

        b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs

13

may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

14

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

32. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

15

on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

    33.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

16

storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

34. The Moving Enterprise is a functioning company that conducts business. The seizure of the Moving Enterprise's computers may limit its ability to conduct its legitimate business. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the Moving Enterprise so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

35. Based on the facts set forth above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1962(d) exist on the business PREMISES of the Moving Enterprise located at 5150 and 5154 Duff Drive, West Chester, Ohio 45246. Further, the above relates to victim complaints, however, I believe records will disclose additional victims and loss amounts in excess of those cited in this affidavit. I therefore request that the Court issue a search warrant directing agents to conduct a search of the PREMISES of

17

the Moving Enterprise, located at the above mentioned address, as further described in

Attachment A and B.

## REQUEST FOR SEALING

36.     It is respectfully requested that this Court issue an order sealing, until further order

of the Court, all papers submitted in support of this application, including the application and

search warrant.  I believe that sealing this document is necessary because the items and

information to be seized are relevant to an ongoing investigation into the criminal conspiracy as

not all of the targets of this investigation will be searched at this time.  Based upon my training

and experience, I have learned that online criminals actively search for criminal affidavits and

search warrants via the Internet, and disseminate them to other online criminals as they deem

appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of

the contents of this affidavit and related documents may have a significant and negative impact

on the continuing investigation and may severely jeopardize its effectiveness.


SPECIAL AGENT BRIAN J. CHRIST
U.S. DOT OIG


Subscribed and sworn to before me
This __24 th__ day of August 2018.


The Honorable Stephanie K. Bowman
United States Magistrate Judge

18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 JUL 25 PM 3: 23

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO.** **1:18CR 109** |
| | : | |
| | : | **JUDGE** **JUDGE BLACK** |
| **v.** | : | |
| | : | **SEALED INDICTMENT** |
| | : | |
| **ANDREY SHUKLIN,** | : | 18 U.S.C. § 1962(d) |
| **SERGHEI VERLAN,** | : | **Forfeiture Allegation** |
| **PHYLLIS RICCI QUINCONES,** | : | |
|   a/k/a "Faith Ashford," | : | |
|   a/k/a "Grace Rubestello," | : | |
|   a/k/a "Phyllis Ricci," | : | |
|   a/k/a "Phyllis Ann," | : | |
| | : | |
| ███████ | : | |
| | : | |
| **VLADIMIR PESTEREANU,** | : | |
|   a/k/a "Vova," | : | |
| | : | |
| ███████ | : | |
| | : | |
| **ROMAN IAKOVLEV,** | : | |
| | : | |
| **JESSICA MARTIN,** | : | |
|   a/k/a "Emma Ricci," | : | |
|   a/k/a "Mary Austin," | : | |
| | : | |
| ███████ | : | |
| | : | |
| | : | |
|   **Defendants.** | : | |

**THE GRAND JURY CHARGES:**

**COUNT ONE**
**(RICO Conspiracy)**

1

## Introduction

At times relevant to this Indictment:

1.      The U.S. Department of Transportation ("USDOT"), Federal Motor Carrier Safety Administration ("FMCSA"), monitors and enforces regulations governing safety and commerce for interstate motor carriers, to include federal regulations governing the transportation of household goods by licensed motor carriers (*i.e.*, movers).

2.      Federal regulations require all interstate motor carriers transporting household goods for individual shippers by motor vehicle to follow federal regulations relating to the interstate transportation of household goods.

3.      Under federal regulations, motor carriers who move household goods must be licensed and registered with the USDOT. To do so, each interstate motor carrier must first apply to operate as a motor carrier of household goods and receive a USDOT number.

4.      Federal forms that interstate motor carriers must complete to operate as movers of household goods include the OP-1 form, the MCSA-1 form, and the MCS-150 form, which are registration and information forms. The OP-1 form, the MCSA-1 form, and the MCS-150 form require that a representative for the interstate motor carrier certify that all information contained in the respective form is true and correct.

5.      Under federal regulations, the USDOT requires interstate motor carriers, among other things, to provide estimates of moving charges to potential customers in writing, indicating whether the estimate is a "binding" or "nonbinding" estimate.

6.      With a binding estimate, the customer and the motor carrier must both agree in writing to a charge for services prior to the start of any work. When an estimate is binding, USDOT prohibits the interstate carrier from raising the price of the move unless the interstate motor carrier and the customer re-negotiate the price prior to the commencement of the move. USDOT regulations

2

forbid interstate motor carriers from increasing the price of a move above the price set forth in a binding estimate after loading customers' household goods.

7.      Failure to meet USDOT requirements can result in a motor carrier being "placed out of service," which means the interstate motor carrier is no longer authorized under federal law to operate as a mover of household goods, and must cease operations.

8.      On or about October 31, 2008, JBR Underground, LLC, doing business as United National Moving and Storage, was authorized by USDOT to operate as a mover of household goods. USDOT ordered JBR Underground, LLC to cease operating as a mover of household goods on or about September 14, 2015.

9.      On or about September 19, 2014, National Relocation Solutions was authorized by USDOT to operate as a mover of household goods. USDOT ordered National Relocation Solutions to cease operating as a mover of household goods on or about October 26, 2015.

10.     On or about November 18, 2014, Independent Van Lines submitted an application to USDOT to operate as a mover of household goods; however, Independent Van Lines failed to comply with other USDOT requirements to obtain authority to operate. USDOT dismissed the application on or about April 27, 2015.

11.     On or about December 24, 2014, National Relocation Van Lines was authorized by USDOT to operate as a mover of household goods. USDOT ordered National Relocation Van Lines to cease operating as a mover of household goods on or about September 17, 2015.

12.     On or about September 18, 2015, US Relocation Systems was authorized by USDOT to operate as a mover of household goods. USDOT ordered US Relocation Systems to cease operating as a mover of household goods on or about June 14, 2016.

3

13.     On or about March 17, 2016, First National Moving and Storage was authorized by USDOT to operate as a mover of household goods.  USDOT ordered First National Moving and Storage to cease operating as a mover of household goods on or about October 4, 2016.

14.     On or about August 17, 2016, Public Moving and Storage was authorized by USDOT to operate as a mover of household goods.  USDOT ordered Public Moving and Storage to cease operating as a mover of household goods on or about July 3, 2017.

15.     On or about February 21, 2017, Public Moving Services was authorized by USDOT to operate as a mover of household goods.  USDOT ordered Public Moving Services to cease operating as a mover of household goods on or about October 18, 2017.

16.     On or about July 3, 2017, Smart Relocation Solutions, a/k/a Presidential Moving Services, was authorized by USDOT to operate as a mover of household goods.  USDOT ordered Smart Relocation Solutions, a/k/a Presidential Moving Services, to cease operating as a mover of household goods on or about March 19, 2018.

17.     On or about December 19, 2017, Unified Van Lines was authorized by USDOT to operate as a mover of household goods.  USDOT ordered Unified Van Lines to cease operating as a mover of household goods on or about May 25, 2018.

18.     On or about April 26, 2018, Flagship Van Lines was authorized by USDOT to operate as a mover of household goods.

### The Racketeering Enterprise

19.     At times relevant to this Indictment, the defendants, **ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann,"** ▮▮▮▮▮▮
▮▮▮▮ **VLADIMIR PESTEREANU, a/k/a "Vova,"** ▮▮▮▮▮▮▮▮
▮▮▮▮▮ ▮▮▮▮▮, **ROMAN IAKOVLEV,** ▮▮▮▮ ▮▮▮▮, ▮▮▮▮

4

█████████████ **JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and** █████████

██████████████████████████████████████ and others known and

unknown to the Grand Jury, operated and worked through the companies set forth in paragraphs 8

through 18 of the Indictment, namely, JBR Underground, LLC, United National Moving and Storage,

National Relocation Solutions, Independent Van Lines, National Relocation Van Lines, US

Relocation Systems, First National Moving and Storage, Public Moving and Storage, Public Moving

Services, Smart Relocation Solutions, Presidential Moving Services, Unified Van Lines, and

Flagship Van Lines, referred to collectively hereinafter as the "affiliated companies," as if they were

a single corporate entity.

20.    At times relevant to this Indictment, the defendants, and others known and unknown

to the Grand Jury, owned, operated, and worked as employees, members, and associates of the

affiliated companies to move interstate shipments of household goods.

21.    At times relevant to this Indictment, **SHUKLIN** and **VERLAN** coordinated and

directed lower-level employees, members, and associates of the affiliated companies.

22.    At times relevant to this Indictment, **SHUKLIN** and **VERLAN** operated the

affiliated companies out of multiple locations throughout the United States, including Florida, Ohio,

Maryland, North Carolina, Illinois, Texas, California, Connecticut, Colorado, and Missouri.

**SHUKLIN** and **VERLAN** operated the affiliated companies principally out of a business address in

Hollywood, Florida.  Starting on or about October 2015, **SHUKLIN** and **VERLAN** also operated

the affiliated companies out of a warehouse in West Chester, Ohio, which is located in the Southern

District of Ohio.

23.    The defendants, **ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI**

**QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann,"**

████████████████████████████████ **VLADIMIR PESTEREANU, a/k/a**

"Vova," ████████████ ████████████████ **ROMAN**

**IAKOVLEV,** ██████████ , ████████████ , **JESSICA MARTIN, a/k/a**

**"Emma Ricci," "Mary Austin,"** and **SETH NEZAT, a/k/a "Andrew Johnson", "Andrew**

**Butler," "Jason," "Kyle Walker,"** and JBR Underground, LLC, United National Moving and

Storage, National Relocation Solutions, Independent Van Lines, National Relocation Van Lines, US

Relocation Systems, First National Moving and Storage, Public Moving and Storage, Public Moving

Services, Smart Relocation Solutions, Presidential Moving Services, Unified Van Lines, and

Flagship Van Lines, and others known and unknown to the Grand Jury, constituted an "Enterprise"

as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals and

entities associated in fact that engaged in, and the activities of which affected, interstate and foreign

commerce, referred to hereinafter as the "Moving Enterprise." The Moving Enterprise constituted

an ongoing organization whose members functioned as a continuing unit for the common purpose of

achieving the objectives and purposes of the Moving Enterprise.

### Purposes of the Enterprise

24.     The purposes of the Moving Enterprise included the following:

(a)     Enrich the Moving Enterprise and the owners, operators, employees,

members, and associates of the Moving Enterprise by defrauding, extorting, and stealing from

customers who hired affiliated companies of the Moving Enterprise to move their household goods.

(b)     Promote and perpetuate the Moving Enterprise and shield its criminal affairs

from law enforcement authorities and customers by concealing the true owners, operators,

employees, and operations of affiliated companies of the Moving Enterprise.

### The Racketeering Conspiracy

25.     Between in or about April 2013, and continuing through the date of this Indictment,

in the Southern District of Ohio and elsewhere, the defendants, **ANDREY SHUKLIN, SERGHEI**

6

**VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello,"** **"Phyllis Ricci," "Phyllis Ann,"** ███████████████████████████████████ **VLADIMIR PESTEREANU, a/k/a "Vova,"** ██████ ████████ ████ ████ ████████████████████ **ROMAN IAKOVLEV,** ██████ ████████ **,** ██████ ████████████, **JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and** ████████ ████████████████████████████████████ and others known and unknown to the Grand Jury, each being a person employed by, a member of, and associated with the Moving Enterprise, an Enterprise engaged in, and the activities of which affected, interstate and foreign commerce, together with others known and unknown to the Grand Jury, did knowingly and intentionally conspire to conduct and participate, directly and indirectly, in the conduct of the affairs of the Moving Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and (5), consisting of multiple acts indictable under:

        (a)     18 U.S.C. § 1343 (relating to wire fraud) and § 2;

        (b)     18 U.S.C. § 659 (relating to the theft from interstate shipment) and § 2;

        (c)     18 U.S.C. § 1951(a) (relating to interference with commerce, robbery, or extortion) and § 2;

        (d)     18 U.S.C. § 1028(a) (relating to fraud and related activity in connection with identification documents) and § 2.

26.     It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Moving Enterprise.

## Manner and Means of the Conspiracy

27.     Among the manner and means employed by the members in conducting and participating in the affairs of the Moving Enterprise were the following:

        (a)     It was part of the conspiracy that members of the Moving Enterprise furthered the conspiracy by making false representations to the USDOT and employees of the

USDOT in order for the Moving Enterprise, through the affiliated companies, to operate as an interstate mover of household goods. This included misrepresentations to the USDOT that affiliated companies of the Moving Enterprise did not share common owners, operators, managers, and employees.

(b)     It was further part of the conspiracy that members of the Moving Enterprise caused counterfeit identification documents (including counterfeit drivers' licenses) to be produced, transferred, used, and possessed to conceal the leadership of affiliated companies of the Moving Enterprise.

(c)     It was further part of the conspiracy that, after customers complained to the USDOT about the criminal actions taken by the Moving Enterprise, members of the Moving Enterprise submitted documents to federal regulators containing misrepresentations in order to operate a new affiliated company of the Moving Enterprise as an interstate carrier of household goods.

(d)     It was further part of the conspiracy that members of the Moving Enterprise used aliases when working on behalf of affiliated companies of the Moving Enterprise to conceal their identities from law enforcement and customers.

(e)     It was further part of the conspiracy that members of the Moving Enterprise submitted fake reviews to online sources regarding services provided by affiliated companies of the Moving Enterprise to induce customers to choose the Moving Enterprise.

(f)     It was part of the conspiracy that members of the Moving Enterprise used wire communications, such as emails, to send false representations to customers and potential customers to induce customers to hire affiliated companies of the Moving Enterprise to move the customers' household goods.

(g)     It was part of the conspiracy that members of the Moving Enterprise

8

furthered the conspiracy by emailing to customers "binding" moving estimates without first conducting an on-site inspection of the household goods.

(h)     It was further part of the conspiracy that binding estimates that members of the Moving Enterprise offered to customers were low so as to induce customers to hire the Moving Enterprise to move the customers' household goods.

(i)     It was further part of the conspiracy that, after agreeing to a binding estimate and loading customers' household goods, members of the Moving Enterprise increased the cost of moves above the price agreed to in the binding estimate.

(j)     It was further part of the conspiracy that, after agreeing to a binding estimate and loading customers' household goods, members of the Moving Enterprise falsely claimed that the customers' household goods took up more cubic footage than was set forth in the binding estimate.

(k)     It was further part of the conspiracy that members of the Moving Enterprise misrepresented to customers the amount of actual cubic footage of household goods involved in moves.

(l)     It was further part of the conspiracy that members of the Moving Enterprise knowingly charged customers for moving more cubic footage of household goods than was actually loaded by members of the Moving Enterprise, and others known and unknown to the Grand Jury.

(m)     It was further part of the conspiracy that members of the Moving Enterprise tracked the "actual" and "real" cubic feet of space that household goods occupied during moves.

(n)     It was further part of the conspiracy that members of the Moving Enterprise would send emails to each other containing documents detailing the "actual" and "real" cubic feet used during moves, along with documents detailing the cubic footage that was used to calculate the amount the Moving Enterprise charged to customers for the same moves.

(o)     It was further part of the conspiracy that, at times, members of the Moving

9

Enterprise caused customers' household goods to be stolen while transporting the goods interstate by not delivering the household goods after loading the household goods and receiving payment for moving the household goods.

(p)    It was further part of the conspiracy that members of the Moving Enterprise extorted, and caused others known and unknown to the Grand Jury to extort, customers into paying money to the Moving Enterprise by increasing the cost of moves after loading customers' household goods and by refusing to relinquish customers' household goods until customers paid an inflated price for delivery of the household goods.

(q)    It was further part of the conspiracy that a member of the Moving Enterprise threatened to injure another person who interfered with the Moving Enterprise's purposes.

**Overt Acts**

28.    In furtherance of the conspiracy and to achieve the illegal objective thereof, the following overt acts, among others, were committed in the Southern District of Ohio and elsewhere:

(a)    On or about June 5, 2014, **SHUKLIN** filed an OP-1 form to the USDOT on behalf of National Relocation Solutions, LLC in which he certified falsely that he did not have any relationship with any other "FMCSA-regulated entity" within the past three years, despite his relationship with another FMCSA-regulated entity within the past three years.

(b)    On or about June 4, 2015, **VERLAN** filed an OP-1 form to the USDOT on behalf of National Relocation Van Lines in which he certified falsely that he did not have any relationship with any other "FMCSA-regulated entity" within the past three years, despite his relationship with another FMCSA-regulated entity within the past three years.

(c)    On or about August 4, 2015, **QUINCOCES** filed an OP-1 form to the USDOT on behalf of US Relocation Systems in which she certified falsely that she did not have any relationship with any other "FMCSA-regulated entity" within the past three years, despite her

relationship with another FMCSA-regulated entity within the past three years.

(d)     On or about April 6, 2016, First National Moving and Storage provided documentation and payment to a third-party company for sales leads that was signed by **SHUKLIN** and an individual ("Individual-1"). Included with the documents was a photocopy of a counterfeit driver's license, where the picture and information on the counterfeit driver's license matched the picture and information on a valid driver's license for ███████, but was actually in the name of Individual-1.

(e)     On or about October 18, 2016, Public Moving and Storage provided documentation to a third-party company for sales leads that was signed by **VERLAN** and another individual ("Individual-2"). Included with the documents was a photocopy of a counterfeit driver's license, in which the picture and information on the counterfeit driver's license matched the picture and information on a valid driver's license for a conspirator, but was actually in the name of Individual-2.

(f)     On or about October 2, 2014, a member of the Moving Enterprise emailed a customer information about National Relocation Solutions, which referred falsely to being in business for 15 years.

(g)     On or about June 19, 2015, a member of the Moving Enterprise emailed a customer regarding a move in Hamilton, Ohio information about National Relocation Van Lines, which stated falsely that National Relocation Van Lines was a family owned and operated company and had been in business since 1999.

(h)     On or about January 22, 2016, a member of the Moving Enterprise emailed a customer regarding a move in Piscataway, New Jersey information about US Relocation Systems, referring falsely to being in business for 15 years.

(i)     On or about October 25, 2017, the Internet webpage for First National

11

Moving and Storage stated falsely that First National Moving and Storage had 15 years of experience transporting household goods.

(j) On or about October 25, 2017, the Internet webpage for Public Moving Services stated falsely that Public Moving Services had "more than 15 years of experience."

(k) On or about October 25, 2017, the Internet webpage for Presidential Moving Services stated falsely that Presidential Moving Services had just celebrated its 20th anniversary.

(l) On or about July 31, 2015, members of the Moving Enterprise, acting through National Relocation Solutions, loaded and caused others known and unknown to the Grand Jury to load a customer's household goods located in Hamilton, Ohio, which is in the Southern District of Ohio. Members of the Moving Enterprise increased the cost of the move above the binding estimate after household goods were loaded on the moving truck. Members of the Moving Enterprise charged the customer for using 2,177 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 1,350 cubic feet of space.

(m) On or about November 5, 2015, members of the Moving Enterprise, acting through US Relocation Solutions, increased the cost of a customer's move above the binding estimate after the household goods were loaded. Members of the Moving Enterprise charged the customer for using 550 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 450 cubic feet of space. Members of the Moving Enterprise never delivered the customer's household goods despite taking possession of the household goods and receiving a down payment for delivery of the household goods.

(n) On or about July 10, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Round Rock, Texas to Columbus, Ohio, which is located in the Southern District of Ohio. Members of Moving Enterprise increased the cost of the move

12

above the binding estimate after the household goods were loaded. A member of the Moving Enterprise also told the customer that the customer had to agree to the higher price or the customer's household goods would not be returned to her. The customer complained about the increased price during subsequent telephone calls from Columbus, Ohio to members of the Moving Enterprise. During one telephone call, a member of the Moving Enterprise told the customer that the Moving Enterprise would auction the customer's goods if the customer did not pay the higher price. Members of the Moving Enterprise charged the customer for using 800 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 500 cubic feet of space.

        (o)      On or about May 24, 2016, members of the Moving Enterprise, through First National Moving and Storage, increased the cost of a move above the binding estimate after the household goods were loaded. When the customer requested that the movers unload the goods at the pickup site rather than pay the higher price, a member of the Moving Enterprise refused and told the customer that an additional payment was required for movers to unload the goods at the pickup site. Members of the Moving Enterprise charged the customer for using 4,150 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 3,300 cubic feet of space. Members of the Moving Enterprise never delivered the customer's household goods, which were stored at the Moving Enterprise's warehouse in West Chester, Ohio, despite taking possession of the household goods and receiving a down payment for delivery of the household goods.

        (p)      On or about May 24, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Fort Wayne, Indiana to Middletown, Ohio, which is located in the Southern District of Ohio, and a storage unit. Members of the Moving

13

Enterprise increased the cost of the move above the binding estimate after loading household goods. Members of the Moving Enterprise charged the customer for using 1,600 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 1,200 cubic feet of space.

(q)     On or about August 7, 2015, members of the Moving Enterprise, acting through National Relocation Solutions, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Mt. Vernon, Ohio, which is located in the Southern District of Ohio, to Mountain View, Arkansas.  Members of the Moving Enterprise charged the customer for using 4,000 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only approximately 3,000 cubic feet of space.

(r)     On or about June 8, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Panama City, Florida to Glenville, North Carolina. Members of the Moving Enterprise charged the customer for using 1,100 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 750 cubic feet of space.

(s)     On or about July 30, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load loaded a customer's goods to transport from Monument, Colorado to Madison, Alabama. Members of the Moving Enterprise charged the customer for using 2,835 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 2,300 cubic feet of space.

(t)     On or about August 12, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the

14

Grand Jury to load a customer's goods to transport from Walton, Kentucky to College Station, Texas. Members of the Moving Enterprise increased the cost of the move above the binding estimate after loading household goods. Members of the Moving Enterprise charged the customer for using 2,751 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 2,300 cubic feet of space.

(u)     On or about August 15, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Front Royal, Virginia to Golden, Colorado. Members of the Moving Enterprise charged the customer for using 1,700 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 1,300 cubic feet of space.

(v)     On or about August 21, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Steger, Illinois to Chandler, Arizona. Members of the Moving Enterprise charged the customer for using 2,800 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 2,300 cubic feet of space.

(w)     On or about June 16, 2017, members of the Moving Enterprise, through Public Moving Services, loaded and caused others known and unknown to the Grand Jury to load a customer's household goods to transport from Steilacoom, Washington to a storage facility in Clarksville, Tennessee. The customer made payments for the move and attempted to arrange delivery on multiple occasions. On or about October 12, 2017, the customer made arrangements with members of the Moving Enterprise to have the household goods delivered to the customer's new home in Tennessee. Members of the Moving Enterprise never delivered any of the customer's

15

household goods and never provided any explanation for not delivering the household goods.

(x)     On or about June 15, 2017, during a telephone call to a third-party company located in Maryland, **VERLAN** threatened to blow up a building owned by the third-party company and shoot the third-party company's employees.

**All in violation of Title 18, United States Code, Section 1962(d).**

### FORFEITURE ALLEGATION

29.     The allegations contained in Count One of this Indictment are hereby incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963, and Title 28, United States Code, Section 2461(c).

30.     Upon conviction of the offense set forth in Count One of this Indictment, the defendants, **ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann,"** ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮**VLADIMIR PESTEREANU, a/k/a "Vova,"**
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **ROMAN IAKOVLEV,**
▮▮▮▮▮▮▮▮▮▮▮▮▮▮**, JESSICA MARTIN, a/k/a "Emma Ricci,"**
**"Mary Austin, and** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ shall forfeit to the United States, pursuant to 18 U.S.C. § 1963, including but not limited to:

(a)     any interest acquired or maintained in violation of 18 U.S.C. § 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

(b)     any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the

16

defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Tile 18, United States Code, Section 1963(a)(2); and

(c)     any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of 18 U.S.C. § 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3);

including, but not limited to, all defendants' ownership interests in the companies listed as part of the enterprise and all property constituting proceeds and a sum of money equal to an amount that represents the proceeds that the defendants obtained as a result of the offense.

## SUBSTITUTE ASSETS

31.     If any of the property described above, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

17

it is the intent of the United States, pursuant to 18 U.S.C. § 1963(m), to seek forfeiture of any

other property of the defendants up to the value of the property described above.

**All pursuant to Title 18, United States Code, Sections 1962, 1963(a)(1), (2), and (3), and (m).**

**A TRUE BILL.**

**GRAND JURY FOREPERSON**

**BENJAMIN C. GLASSMAN**
**UNITED STATES ATTORNEY**

**MATTHEW SINGER / MEGAN GAFFNEY**
**ASSISTANT UNITED STATES ATTORNEYS**

18

EG

## ATTACHMENT A

### *Property to be searched*

The property to be searched is a warehouse located at 5150 and 5154 Duff Drive, West Chester, Ohio 45246 (the PREMISES). The warehouse is located in an industrial building with units 5142 to 5170 Duff Road, West Chester Township, OH located in the building. The building is tan and grey and primarily metal with a flat roof. On the east side of the building there is a parking lot and entrances and bay doors for the various businesses located in the industrial building. The PREMISES is located near the middle of the building. On the east side of the building, there are approximately 6 steps to reach a landing. There is a red awing with an Environmental Inks sign on the awing covering a portion of the landing. On the landing and under the awning there are two entrance doors for the PREMISES. One door is for 5150 Duff Road, West Chester Township, OH 45246 and one door is for 5154 Duff Road, West Chester Township, OH 45246. The 5150 and 514 Duff Road units are connected internally. The aforementioned entrance has windows but they are covered with blinds or paper from the inside of the building. On the glass of the entrance doors to the PREMISES are the numbers "515" on one door and "515" on another. On the east side of the building, there are approximately three windows for the PREMISES, which are also covered with blinds or paper from the inside of the building. The other units located in the industrial building each have their own entrance.







**ATTACHMENT B**

*Property to be seized*

1.        All records and information relating to violations of 18 U.S.C. § 1962(d), those

violations involving the financial or business affairs of JBR Underground, LLC, United National

Moving and Storage, National Relocation Solutions, Independent Van Lines, National

Relocation Van Lines, US Relocation Systems, First National Moving and Storage, Public

Moving and Storage, Public Moving Services, Smart Relocation Solutions, Presidential Moving

Services, Unified Van Lines, and Flagship Van Lines, and ANDREY SHUKLIN, SERGHEI

VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis

Ricci," EVGENIA KUKUY, a/k/a "Jenny K," "Evgenia Kukuv," VLADIMIR PESTEREANU,

a/k/a "Vova," IEVGEN KARIAKA, a/k/a "Eugene," AKHLIDDIN KALONOV, ROMAN

IAKOVLEV, SANJAR FAYZIVEY, SERGEY BOCHAROV, JESSICA MARTIN, a/k/a

"Emma Ricci," "Mary Austin," and SETH NEZAT, a/k/a "Andrew Johnson," "Andrew Butler,"

"Jason," "Kyle Walker," and others (referred to collectively as the "Moving Enterprise"), and

occurring after April 2013, including:

> a.  Records and information showing ownership and control of the Moving Enterprise,
>     and its affiliated companies, which may or may not have been mentioned above,
>     including but not limited to the following:
>
>> (i)      Corporate minutes, agreements, contracts, filings and correspondence
>>          reflecting, relating to, or concerning the Federal Motor Carrier Safety
>>          Administration (FMCSA), United States Department of Transportation
>>          (USDOT), various Secretary of State, to include but limited to Florida,
>>          North Carolina, Texas, Ohio, Illinois, Maryland and Connecticut;

(ii)    Articles of personal property tending to establish the identity of victims and their property and the identity of persons in control of the premises, including but not limited to utility bills and receipts, rent receipts, cancelled mail envelopes, identification and/or travel documents and other items which establish personal identification;

b.  Sales documents (including estimates, quotes and requests for quotes), bill of ladings, contracts, sales agreements, binding estimates, nonbinding estimates, revised estimates and other documents including correspondence, whether in draft or final form, concerning current or previously received requests or inquires for any customer of the Moving Enterprise and its affiliated companies, which may or may not have been mentioned above.

c.  Records and information, including correspondence (recordings, records, facsimile, or e-mail) and files, relating to estimates, revised estimates, payment for services, charges for moves, cubic footage used in moves, storage of household goods, and the transportation of household goods by the Moving Enterprise and its affiliated companies, which may or may not have been mentioned above.

d.  Records and information relating to the identifies of employees, owners, and associates of the Moving Enterprise and its affiliated companies, which may or may not have been mentioned above.

e.  Records and information relating to victims and actual ownership of property in the custody and control of the Moving Enterprise and its affiliated companies, which may or may not have been mentioned above.

f. Payment information for household good moving services provided by the Moving Enterprise and its affiliated companies, which may or may not have been mentioned above, including financial records or documents, spreadsheets, records of payments, records of accounts payable and receivable, letters of credit, credit card invoices or authorization, bank checks, wire transfers.

g. Notes memorializing any conversation involving any estimates, revised estimates, transportation of household goods, the ownership of the Moving Enterprise and its affiliated companies, which may or may not have been mentioned above.

h. Tax returns, IRS filings, financial statements, any related work papers.

i. Records of personal or business activities relating to the operation or ownership of any computer hardware, software, storage media, or data (such as usernames, passwords telephone records, notes, books, diaries, and reference materials).

j. Records and information pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media.

k. Records and information related to personnel files containing, but not limited to, time cards, time sheets, payroll sheets, benefits paid, check stubs, jobs worked on, relating to current and former employees.

l. Records and information tending to show the identities of former employees, employees, associates or co-conspirators.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

      i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

      j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

      k.   records of or information about Internet Protocol addresses used by the COMPUTER;

      l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

      m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.